## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LHO CHICAGO RIVER, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 16 C 6863 |
| | ) | |
| ROSEMOOR SUITES, L.L.C, | ) | |
| PORTFOLIO HOTELS & RESORTS, | ) | |
| L.L.C, and CHICAGO HOTEL, L.L.C, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

This matter comes before the Court on Plaintiff LHO Chicago River, L.L.C.'s ("LHO") Motion for Preliminary Injunction against Defendants Rosemoor Suites, L.L.C.; Portfolio Hotels & Resorts, L.L.C.; and Chicago Hotel, L.L.C. (collectively, "Defendants") pursuant to Federal Rule of Civil Procedure 65. For the following reasons, the Court denies LHO's Motion.

## BACKGROUND

The subsequent facts are adopted from Magistrate Judge Susan E. Cox's Report and Recommendation. Additional facts are taken from the Complaint, the parties' briefs, and the evidentiary hearing held before the Court on November 17, 2016 (the "hearing"). The Court relies on sealed exhibits in its analysis, and we cursorily discuss such evidence to protect the confidential information contained therein.

Both parties claim to own the would-be mark "'Hotel Chicago' for use with hotel services." At the hearing, Joseph Perillo ("Perillo"), an automobile dealer and owner of the hotel located at 1622 West Jackson Boulevard in the West Loop Medical District neighborhood of Chicago, Illinois (the "Medical District Hotel"), testified that he contracted for the hotel at "the end of 2012." On or around January 4, 2013, "Defendants formed a limited liability company," (the "L.L.C."), "and 'filed for the assumed name of HOTEL CHICAGO' with the Illinois Secretary of State." Perillo testified that the name of the L.L.C. is "Chicago Hotel, L.L.C.," and "Hotel Chicago" is the assumed name that he also secured. Perillo stated that on March 19, 2013, he closed on the hotel. The Medical District Hotel was first known as Rosemoor Hotel, which in Perillo's words, "was a flophouse." He claims that Rosemoor Hotel had "unsavory customers," such as "dope-pushers . . . and prostitutes."

However, Perillo contends that he rebranded the Rosemoor Hotel and started operating it as "Hotel Chicago" "during a soft partial opening period," beginning in September 2013. Defendants claim that, during this time, they "organically began changing signs, and using HOTEL CHICAGO with . . . suppliers, some customers, and constructors," as they started "to renovate the hotel." In September 2013, Perillo claims that he hired an architect and a sign company. Perillo testified that he requested that the sign company retain the existing sign, but change the lettering on it from "Rosemoor Hotel" to "Hotel Chicago." Perillo contends that the Medical District Hotel "kept in business" during the entire rebranding period.

"As proof of this rebranding effort" and the Medical District Hotel's operation as "Hotel Chicago" during 2013, Defendants offered into evidence two undated parking signs that Perillo claims were displayed as of September 2013. They read: "Parking Only for Chicago Hotel Guests" and "All Deliveries in Rear for Chicago Hotel LLC." Perillo testified that the latter sign "was in the alley and the back door, so that . . . people who were" making deliveries "weren't confused that they were in the wrong hotel" since "the sign in the front . . . still" displayed the "Rosemoor Hotel" lettering. The former sign, he stated, "was in the parking lot" since people were bringing and leaving their cars there "while they went to . . . sporting events or concerts" at The United Center. Perillo contends that the signs were taken down after the name "Hotel Chicago" replaced the "Rosemoor Hotel" lettering out front.

LHO claims that it began using the would-be "Hotel Chicago" mark in February 2014 when it rebranded Hotel Sax to "Hotel Chicago," located at 333 North Dearborn "in the River North neighborhood of Chicago (the 'River North Hotel')." The River North Hotel has been using the would-be "Hotel Chicago" mark since then. The River North Hotel is currently the only hotel in Illinois that is part of the Autograph Collection of Marriott hotels. According to LHO, the Autograph Collection is "a global ensemble of 106 upscale, independently-owned hotels, each selected for its quality and character." LHO claims that "the Autograph Collection is the lodging industry's fastest growing upscale brand." The River North Hotel is marketed with over 4,000 Marriott hotels in more than "80 countries and territories."

Guests of the River North Hotel also "enjoy all of the benefits of Marriott Rewards," which LHO claims is an "award-winning loyalty program."

Alfred Young ("Young"), the Chief Operating Officer of LaSalle Hotel Properties, testified that LHO "spent roughly a million and a half dollars per year," or nearly 4 to 4.5 million dollars over the course of three years, in general advertising and marketing of the River North Hotel. This figure includes labor costs, trade shows, and other sales initiatives. It does not, however, include the "fees paid to Marriott in connection with the franchise agreement," which costs around 2.5 to 2.8 million dollars. This additional sum includes "website presence and internet advertisements; annual membership in travel associations and resources . . .; investment in hotelier event management technology; participation in national trade shows; advertisements in travel and wedding publications and mailers; and email campaigns." Of these sums, LHO contributed "$300,000 in brand awareness marketing" of "Hotel Chicago" specifically.

The River North Hotel has been thriving. Each night, it has "354 rooms available for sale." At the hearing, LHO stated that since 2014, the River North Hotel has booked "approximately 300,000 room nights," "represent[ing] a nearly 20 percent increase in bookings compared to" Hotel Sax. At the end of 2013, LHO was around 65-66 percent occupancy, and it predicted that it will end 2016 around 87-88 percent occupancy.

"On January 28, 2016, Portfolio Hotels & Resorts," which operates the Medical District Hotel, "registered the domain name of 'hotelchicago1622.com.'" Defendants also filed two intent-to-use applications with the United States Patent and Trademark Office (the "USPTO") for the would-be "Hotel Chicago" mark "in connection with hotel services." On February 17, 2016, they "filed . . . an intent-to-use application . . . U.S. Serial No. 86/910,607, for registration of the mark HOTEL CHICAGO for use in connection with hotel services in International Class 43." On March 2, 2016, they filed "a second intent-to-use application, U.S. Serial No. 86/926,504, for registration of the" HOTEL CHICAGO associated design "for use in connection with hotel services in International Class 43."

At the hearing, Perillo testified that the grand opening of the Medical District Hotel occurred in May 2016, which is when LHO claims that Defendants first began using the would-be "Hotel Chicago" mark. Perillo testified that, today, the Medical District Hotel is "a three-star" "boutique hotel." He stated that "[i]t's not . . . real fancy, but it's a cute hotel, . . . it's very clean, . . . the people are nice, and [it] offer[s] rooms for the general public around, mostly for the for the people that are convenient to the medical center and [T]he United Center and all the businesses around there."

The River North and Medical District hotels are approximately three miles apart. "LHO has documented several instances of guest confusion," where "guests have arrived at the River North Hotel, only to find out upon check-in that . . . their reservations were at" the Medical District Hotel.

Defendants claim that they "were unaware of [LHO's] use of the expression HOTEL CHICAGO until" on or around June 15, 2016, when they received a cease and desist letter from LHO. On June 30, 2016, "LHO brought the instant suit." LHO "does not own a registration." Instead, "LHO asserts four claims against Defendants: federal trademark infringement and unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); trademark infringement under Illinois common law; and deceptive trade practices under the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1 *et seq.*"

On June 30, 2016, LHO also filed a Motion for Preliminary Injunction, which we referred to Magistrate Judge Cox for a Report and Recommendation. On August 25, 2016, Magistrate Judge Cox recommended that the Court grant LHO's Motion for Preliminary Injunction, enjoining Defendants "from using the trademark 'Hotel Chicago' in connection with hotel services." On September 8, 2016, Defendants filed their written objections to the Report and Recommendation. LHO filed its Response to Defendants' written objections on September 19, 2016. The Court determined that it would be prudent to hold an evidentiary hearing. *See* 28 U.S.C. § 636(b)(1) ("The judge may also receive further evidence."). We did so on November 17, 2016. At the hearing, Young and Mark Deinhart ("Deinhart"), the General Manager of the River North Hotel, testified for LHO. Jennifer Knoedl ("Knoedl"), an entrepreneur; Imran Jivani ("Jivani"), General Manager of the Medical District Hotel, former Director of Front Office Operations at the River North Hotel, and teacher of "Hospitality Property

6

Management Systems" at Kendall College; and Perillo, testified for Defendants. Based on the record evidence, LHO has failed to meet its burden of demonstrating that it is likely to succeed on the merits, specifically, in proving that the would-be "Hotel Chicago" mark has acquired secondary meaning, rendering it protectable. We therefore deny LHO's Motion for Preliminary Injunction.

## LEGAL STANDARD

### I.    Preliminary Injunction

"The purpose of preliminary injunctive relief is 'to minimize the hardship to the parties pending the ultimate resolution of the lawsuit.'" *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 726 (7th Cir. 1998) (quoting *Faheem–El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988)). "A party seeking to obtain a preliminary injunction must" demonstrate three points. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). First, it must show that "its case has some likelihood of success on the merits;" second, "no adequate remedy at law exists; and" third, "it will suffer irreparable harm if the injunction is not granted." *Id.* "If the court is satisfied that these three conditions have been met, then it must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted." *Id.* The Court balances this harm "against the irreparable harm the moving party will suffer if relief is denied." *Id.* "Finally, the court must consider the public interest," or that of non-parties, "in denying or granting the injunction." *Id.* "[T]he more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the

plaintiff's position." *Id.* "The sliding scale approach is not mathematical in nature." *Id.* Instead, it is "subjective and intuitive," and it allows the Court "to weigh the competing considerations and mold appropriate relief." *Id.* at 896 (citation omitted).

## II.     The Report and Recommendation

The Court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(a) ("The district judge . . . must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law."). This "requires the district judge to decide the case based on an independent review of the evidence and arguments without giving any presumptive weight to the magistrate judge's conclusion." *Mendez v. Republic Bank*, 725 F.3d 651, 661 (7th Cir. 2013). Although LHO takes issue with the arguments and evidence that Defendants presented for the first time in their objections, a "district judge is free, and encouraged, to consider all of the available information about the case." *Id.* The Court "may accept, reject, or modify, in whole or in part" the Report and Recommendation. 28 U.S.C. § 636(b)(1).

## III.    Trademark Infringement

"In a trademark infringement claim, the plaintiff must demonstrate: (1) the validity of its trademark; and (2) the infringement of that mark." *Platinum*, 149 F.3d at 726. "The validity of a mark pertains to whether a 'word, term, name, symbol or device' . . . is entitled to protection under trademark law by focusing on whether that

mark specifically identifies and distinguishes one company's goods or services from those of its competitors." *Id.* "The infringement of a mark concerns whether the actions of a subsequent user of a substantially similar or identical mark causes a likelihood of confusion among consumers as to the source of those specific goods or services." *Id.*

"When the identifying 'word, term, name, symbol or device' claimed as a trade name or mark is not registered with the" USPTO, "the burden is on the claimant . . . to establish that it is entitled to protection under § 43(a) of the Lanham Act." *Id.* at 727; *see Mil-Mar Shoe Co., Inc. v. Shonac Corp.*, 75 F.3d 1153, 1156 (7th Cir. 1996). "[T]he general principles qualifying a mark for registration under . . . the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). Since LHO "does not own a registration but instead is only asserting common law rights," it "does not benefit from the Lanham Act's[ ] presumptions of ownership, validity of the mark, and enforcement rights." *See Platinum*, 149 F.3d at 726–27. Thus, to ultimately prevail, LHO must prove ownership of the would-be "Hotel Chicago" mark, that it is entitled to protection, and that Defendants' use of "Hotel Chicago" is likely to cause confusion among consumers. *See id.* "The analysis is the same for the remaining claims of common law trademark infringement and deceptive trade practices." *See Tony Jones Apparel, Inc. v. Indigo USA LLC*, No. 03 C 0280, 2003 WL 22220193, at *5 (N.D. Ill. Sept. 24, 2003).

## DISCUSSION

The notion of fairness lies at the heart of the matter before the Court, and it is seated between two broad principles. The first is that "a preliminary injunction is an exercise of very far-reaching power, never to be indulged in except in a case clearly demanding it." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008) (citation omitted); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (maintaining that injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief"). The second stems from fostering competition, particularly in the realm of intellectual property, as "consumers benefit from competing products in the marketplace, [therefore] we often want to encourage copying of products or features of products which are not protected under the patent and copyright laws." *Lacour v. Time Warner, Inc.*, No 99 C 7105, 2000 WL 688946, at *5 n.6 (N.D. Ill. May 24, 2000) (citation omitted). We begin with "[t]he threshold consideration in a motion for a preliminary injunction," which "is the moving party's likelihood of success on the merits of the underlying claim." *Platinum*, 149 F.3d at 726. We disagree with Magistrate Judge Cox's conclusion that LHO "is likely to succeed on the merits" in proving that "Hotel Chicago" is entitled to protection, which is fatal to their request for a preliminary injunction.

## I.       LHO's Likelihood of Success on the Merits

"In the trademark . . . field, the movant shows a likelihood of success by establishing that 1) [it] has a protectable mark, and 2) that a 'likelihood of confusion' exists between the marks or products of the parties." *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1115 (7th Cir. 1997); *see Ty, Inc.*, 237 F.3d at 897 (quoting *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988)).  The Seventh Circuit has consistently held that "a 'likelihood of success' exists if the party seeking injunctive relief shows that it has a 'better than negligible' chance of succeeding on the merits." *Meridian*, 128 F.3d at 1114; *see Int'l Kennel Club*, 846 F.2d at 1084.  "This is an admittedly low requirement, and is simply a threshold question." *Girl Scouts*, 549 F.3d at 1096.

In concluding that LHO "is likely to succeed on the merits," Magistrate Judge Cox decided that it has a "better than negligible chance" of proving that: (i) LHO is the owner of "Hotel Chicago;" (ii) it has priority over the mark; (iii) "Hotel Chicago" is not generic, which would mean that it is not entitled to protection; (iv) instead, it is descriptive; (v) it has acquired secondary meaning in the marketplace, rendering the descriptive mark protectable; and (vi) the mark is likely to cause confusion among consumers.  Although Magistrate Judge Cox believed that "'Hotel Chicago' will likely be found to be descriptive," she noted that she "harbors some doubts about whether LHO will be able to prove secondary meaning sufficient to receive protection for that mark."  We harbor many doubts.

While we agree with Magistrate Judge Cox's conclusions that LHO has a "better than negligible chance" of proving points (i)-(iv) and point (vi), we hold that it has not met its burden of demonstrating that it has a "better than negligible" chance of proving that the would-be "Hotel Chicago" mark has acquired secondary meaning, rendering it protectable. We analyze LHO's likelihood of success on the merits below.

## A.    Priority

First, Defendants argue that "they were the first to use the 'Hotel Chicago' mark," and therefore, "they own the rights to the HOTEL CHICAGO mark as the senior user," while "LHO is the junior user of the trademark, and lacks priority or enforceable rights in the trademark." LHO, in contrast, argues that it "won the race to the marketplace," as it "has continuously used the HOTEL CHICAGO mark in connection with hotel services since at least as early as February 2014 when it rebranded the hotel from the HOTEL SAX . . . to the HOTEL CHICAGO." LHO has a "better than negligible chance" of proving that it has priority rights in and to the would-be "Hotel Chicago" mark.

"Trademark rights are acquired by adoption and use, not by registration." *S Indus., Inc. v. Stone Age Equip., Inc.*, 12 F. Supp. 2d 796, 804 (N.D. Ill. 1998) (citation omitted); *see United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918). Under the common law, "use" is defined as "sales to the public of a product with the mark attached," or winning "the race to the marketplace," and establishing an

"exclusive right to the mark." *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992). A senior user of a trademark is one who first uses it "in a genuine commercial transaction." *Stone Age*, 12 F. Supp. 2d at 805. This "use must be continuous and bona fide to impart ownership—de minimus sales, a few shipments, or pre-marketing tactics that attempt to 'reserve' the mark will not do." *Id.*

In support of their argument that LHO is a junior user, Defendants first contend that they "used the mark CHICAGO HOTEL/HOTEL CHICAGO" by "form[ing] CHICAGO HOTEL, LLC," on January 3, 2013, and "secur[ing] the assumed name HOTEL CHICAGO" from the Illinois Secretary of State. Here, Defendants cite to an "Application to Adopt an Assumed Name," which states that Defendants "intend to adopt and transact business under the assumed name of: HOTEL CHICAGO." "Intent is not enough; there must be actual use of the trademark with the goods and services to establish trademark rights." *See Zazu*, 979 F.2d at 504 ("Intent to use a mark, like a naked registration, establishes no rights at all."). Magistrate Judge Cox believed that Defendants demonstrated a mere "intention to open a hotel with the name 'Hotel Chicago.'" We agree; LHO is right in concluding that "Defendants' Secretary of State filing in 2013 does not establish any rights to the mark, as it does not show that the mark was actually used in connection with an existing business." *See id.* at 504.

Next, Defendants offer into evidence "undated parking lot signage that refers to 'Chicago Hotel LLC' and 'Chicago Hotel," in support of their assertion "that they

have used the mark 'CHICAGO HOTEL/HOTEL CHICAGO' since 2013." Defendants argue that if they "prove[ ] one commercial transaction," they own "rights in the mark." LHO, in contrast, claims that "[t]wo parking signs, marked with CHICAGO HOTEL, are not enough to allow consumers to associate Defendants' hotel services with the mark HOTEL CHICAGO." LHO is correct; this "is not evidence of a 'genuine commercial transaction' sufficient to establish use." *See Stone Age*, 12 F. Supp. 2d at 805 ("The use must be continuous and bona fide to impart ownership . . . tactics that attempt to 'reserve' the mark will not do.").

LHO argues that before 2016 Defendants' "business was still operating as a single-room occupancy hotel under the name Rosemoor Hotel," citing a settlement that Defendants entered into in August 2014 when they "agreed to pay an undisclosed cash settlement to" Rosemoor Hotel tenants. LHO also cites to a class action lawsuit that a Rosemoor Hotel tenant filed in January 2015 "against Defendants on behalf of 'All Rosemoor Hotel guests and other persons lawfully on the premises of the Rosemoor Hotel who were injured or sustained damage as a result of the hotel's Bed bug infestation from October 31, 2011 to the present." LHO claims that, "[i]n their Answer, Defendants admitted . . . the name and location of the Rosemoor Hotel."

LHO further contends that "Defendants admit that Portfolio Hotel & Resorts did not register the domain name of 'hotelchicago1622.com' until January 28, 2016." Moreover, LHO claims that Defendants also "admit that on February 27, 2016 and March 2, 2016, respectively, Rosemoor filed with the USPTO *intent-to-use*

applications . . . to register the HOTEL CHICAGO mark and associated design mark." Finally, LHO points to the fact that Defendants do not have "any hotel receipts with the name 'Hotel Chicago' dated prior to 2016." Thus, LHO argues that "Defendants did not use the HOTEL CHICAGO mark in connection with an existing business until 2016 at the earliest, two years after LHO's date of first use of February 2014."

Magistrate Judge Cox was unpersuaded with Defendants' evidence of the Medical District Hotel's "soft opening" to the public, which occurred before 2014, and analogized it to "the smattering of sales that the Seventh Circuit rejected as a genuine commercial transaction in *Zazu*." *See Zazu*, 979 F.2d at 502–03 (holding that sporadic sales of hair products and ordering 25,000 bottles with silkscreened mark is "insufficient use to establish priority"). Therefore, she concluded that Defendants' use prior to 2016 was "not the type of continuous and bona fide use required by other courts in this district." *See id.* Magistrate Judge Cox found "that there is a very strong likelihood that LHO will be able to show that it was the first party to engage in a genuine commercial transaction using the relevant mark, and that Defendants do not have priority over the mark." We hold that LHO has a "better than negligible" chance of proving that it is the senior user of the would-be "Hotel Chicago" mark.

### B. Ownership

Second, Defendants argue that LHO does not benefit from a presumption of ownership, and that it is unclear whether HEI Hotels, LHO, or LaSalle Hotel Properties owns the would-be "Hotel Chicago" mark. Here, LHO cited Sarah Gulla's

("Gulla"), Vice President of Asset Management for LaSalle Hotel Properties, which is the general partner of LHO's sole member, declaration in support of its assertion that it owns the would-be "Hotel Chicago" mark "for use with hotel services." Further, at the hearing, LHO submitted evidence of a leasing agreement. Although the leasing agreement outlines a complex ownership structure, LHO has a "better than negligible" chance of proving that it is the owner of the would-be "Hotel Chicago" mark.

LHO provided sufficient evidence demonstrating that it is likely to prove that the River North Hotel "basically [has] a lease with" itself, thus, making it the owner of the would-be "Hotel Chicago" mark. Young testified that the lease is "a paper structure" to match the Real Estate Investment Trust ("REIT") "laws of passive income." LHO is likely to prove the following. First, that LaSalle Hotel Properties, a lodging REIT, owns the River North Hotel. Second, that LHO Chicago River, L.L.C., the landlord, and LHO Chicago River Lessee, L.L.C., the tenant, have a lease agreement that addresses "the ownership of assets, including service marks and real estate." Under this agreement, LHO Chicago River Lessee, L.L.C. "is an entity set up to lease the real and intellectual property from LHO River, LLC," and functions as "a taxable REIT subsidiary." "[T]he landlord lease[s] the trademarks and intellectual property to the lessee." The lessee retains rights in service marks. Thus, LHO is likely to prove that LHO Chicago River, L.L.C., a subsidiary of LaSalle Hotel Properties, is "the entity that owns the real and intellectual property" of the River North Hotel, including the would-be "Hotel Chicago" mark.

LHO has a "better than negligible chance" of proving that it was the first to use the would-be "Hotel Chicago" mark and that it owns the would-be "Hotel Chicago" mark. However, it is unlikely to prove that it has a protectable mark, as discussed below.

## C.    Types of Trademarks

"The first step in determining whether an unregistered mark or name is entitled to the protection of the trademark laws is to categorize the name according to the nature of the term itself." *Int'l Kennel Club*, 846 F.2d at 1085. "The commercial impression of a trade-mark is derived from it as a whole, not from its elements separated and considered in detail, so "it should be considered in its entirety." *Estate of P.D. Beckwith, Inc., v. Comm'r of Patents*, 252 U.S. 538, 545–46 (1920); *see Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 966–67 (Fed. Cir. 2015). Trademarks can be grouped into one of four categories: (i) arbitrary; (ii) suggestive; (iii) descriptive; and (iv) generic. *See Int'l Kennel Club*, 846 F.2d at 1085. The first two receive full trademark protection. *Id.* However, generic terms may not be protected, and descriptive terms "may be trademarked only if they have acquired secondary meaning." *See id.* (emphasis omitted).

Defendants argue that the would-be "Hotel Chicago" mark is either generic, or it is descriptive and "lacks secondary meaning sufficient to provide trademark protection." Magistrate Judge Cox stated that "it is extremely unlikely that Defendants will prove that LHO's trademark is generic." The burden is not on

Defendants to prove that "Hotel Chicago" is generic, but rather on LHO to prove that it is not. We find that LHO has a better than negligible chance of proving that the would-be "Hotel Chicago" mark is not generic.

### 1. Generic Trademarks

"[A] generic term merely specifies the type, or genus, of thing into which common linguistic usage consigns that product." *Gimix, Inc. v. JS&A Grp., Inc.*, 699 F.2d 901, 905 (7th Cir. 1983); *H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chefs, Inc.*, 782 F.2d 987, 989 (Fed. Cir. 1986) ("A generic term is the common descriptive name of a class of goods or service."). "Even if each of the constituent words in a combination mark is generic, the combination is not generic unless the entire formulation does not add any meaning to the otherwise generic mark." *Princeton*, 786 F.3d at 967 (citation omitted). Courts consider several factors "when determining whether a particular mark is generic," including "(1) competitors' use; (2) plaintiff's use; (3) dictionary definitions; (4) media usage; (5) testimony of persons in the trade; and (6) consumer surveys." *Ty, Inc. v. Jones Grp., Inc.*, 98 F. Supp. 2d 988, 994 (N.D. Ill. 2000).

Defendants argue that because the Federal Circuit ruled in *In re Hotels.com, L.P.* that HOTELS.COM is generic, "no one can own or enforce HOTELS or HOTEL in association with hotel services." *In re Hotels.com, L.P.*, 573 F.3d 1300, 1301 (Fed. Cir. 2009). However, the Federal Circuit's holding was not so expansive. *See id.* at 1306 (concluding, on appellate review, that the Trademark Trial and Appeal Board

"satisfied its evidentiary burden," and that its finding, "demonstrating that the separate terms 'hotel' and '.com' in combination have a meaning identical to the common meaning of the separate components . . . was supported by substantial evidence").

Moreover, while Defendants argue that the would-be "Hotel Chicago" mark is not protectable, simultaneously, they filed two "intent-to-use applications for registration of the HOTEL CHICAGO mark and associated design mark." Thus, LHO contends that Defendants have "effectively admit[ed] that the [would-be] mark is capable of acquiring secondary meaning." The Court agrees with LHO's assertion that Defendants cannot "skirt" these applications. Howard Fine, "an experienced intellectual property lawyer, who . . . is listed as the attorney of record on over 275 active trademark applications and registrations," filed the applications, and Perillo signed and declared that he, as "the applicant[,] has a bona fide intention, and is entitled to use the mark in commerce on or in connection with the goods/services in the application."

LHO argues that the USPTO "agrees that the HOTEL CHICAGO mark is not generic" because it "recently issued an office action on" Defendants' "application to register the HOTEL CHICAGO word mark in connection with hotel services." "In the office action, the USPTO Examining Attorney suggested that the mark was registerable on the Supplemental Register, thus acknowledging that the HOTEL CHICAGO mark is at least a descriptive mark capable of functioning as a source identifier." *See* 15 U.S.C. § 1091(c) (stating that marks registered on the

Supplemental Register "must be capable of distinguishing the applicant's goods or services"); *Ethicon, Inc. v. Deknatel Inc.*, 183 U.S.P.Q. 503, 1974 WL 20012, at *3 (T.T.A.B. 1974) (maintaining that generic terms are ineligible for registration on the Supplemental Register).

LHO also contends that "the phrase HOTEL CHICAGO is not generic because HOTEL CHICAGO is not the common name for hotel services," "[e]ven if each of the constituent words, HOTEL and CHICAGO, is generic." *See In re K-T Zoe Furniture, Inc.*, 16 F.3d 390, 393 (Fed. Cir. 1994) ("[T]he phrase 'the sofa & chair company' is not generic for the services for which registration is sought, for the common meaning of the phrase does not clearly include the specificity of this particular custom upholstery service."). According to LHO, "[t]he combination adds meaning; it provides information as to the location of LHO's hotel services." Finally, LHO claims that "a geographically descriptive mark . . . is not generic and is capable of acquiring secondary meaning." *See S. Ill. Storm Shelters v. 4Semo.com, Inc.*, No 13-0297-DRH, 2014 WL 691573, at *4 (S.D. Ill. Feb. 24, 2014); *W. Bank v. W. Bancorporation*, 47 Or. App. 191, 194 (1980) ("Because the words 'Western Bank' are geographically descriptive words, to prove a protectable interest in the name plaintiff first had to establish that the name carries a 'secondary meaning.'").

Magistrate Judge Cox concluded that the would-be "Hotel Chicago" mark is not generic. In support of her conclusion, she cited "high-profile marks" that consist of "combination[s] of generic terms," geographic identifiers, or both. These include:

Kentucky Fried Chicken, American Apparel, and Bank of America. We hold that LHO has a "better than negligible" chance of proving that the would-be "Hotel Chicago" mark is not generic. However, although the would-be "Hotel Chicago" mark is likely descriptive and potentially *can* acquire secondary meaning, LHO failed to provide the Court with sufficient evidence to demonstrate that it has a "better than negligible chance" of proving that the mark *has* acquired secondary meaning, as outlined below.

## 2. Descriptive Trademarks

"A term is . . . descriptive if it specifically describes a characteristic or an ingredient of a product." *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 906–07 (7th Cir. 1986). A descriptive term is generally not protectable. *See id.* at 907. However, "[b]y acquiring secondary meaning," it "can become a valid trademark." *Id.* "A mark acquires secondary meaning when it has been used *so long* and *so exclusively* by one company in association with its products or services in that particular industry that the 'word, term, name, symbol, or device' has come to mean that those products or services are the company's trademark." *Platinum*, 149 F.3d at 728 (emphasis added) (citation omitted); *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.*, 698 F.2d 862, 865 (7th Cir. 1983). Secondary meaning exists when "there is 'a mental association in buyers' minds between the alleged mark and a *single source* of the product." *Echo Travel, Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264, 1266 (7th Cir. 1989) (citation omitted) (emphasis added). "[A] court may

consider several factors to decide whether secondary meaning has been acquired or established: (1) the amount and manner of advertising; (2) the sales volume; (3) the length and manner of use; (4) consumer testimony; and (5) consumer surveys." *Platinum*, 149 F.3d at 728; *Gimix*, 699 F.2d at 907.

First, in an attempt to undermine LHO's exclusive use of the would-be "Hotel Chicago" mark, Defendants claim that LHO "uses various modifiers and designs to brand" the River North Hotel, "including THE HOTEL CHICAGO, HOTEL CHICAGO DOWNTOWN, and HOTEL CHICAGO DOWNTOWN AUTOGRAPH COLLECTION," arguing that "[i]nconsistent use does not support a finding of secondary meaning." *See Gimix*, 699 F.2d at 907. Moreover, Defendants contend that "[t]he mark HOTEL CHICAGO does not indicate a single source of hotel services since almost all, if not all, hotels in Chicago use this expression to advertise characteristics of their hotels." According to Defendants, an internet "search on or around July 26, 2016 for the expression HOTEL CHICAGO . . . uncovered multiple uses of the expression HOTEL CHICAGO by various third parties used in connection with hotel services in Chicago, including for example the AC HOTEL CHICAGO." LHO argues that "these hotels do not market themselves as HOTEL CHICAGO; rather, they are marketed under the prefix hotel name, often a national brand, and use the suffix 'Chicago' as only a geographical identifier." LHO cites, for example, "Virgin Hotels," "The Peninsula," and "Crowne Plaza Chicago Metro." Similarly, LHO claims that The AC Hotel Chicago Downtown "is not marketed as HOTEL

CHICAGO." Instead, it is "marketed under the name AC HOTELS," appending "the suffix 'Chicago Downtown'" as "a geographical identifier." Thus, LHO maintains that unlike these hotels, the River North Hotel is marketed as, and books rooms under, the "Hotel Chicago" name. Magistrate Judge Cox agreed with LHO. She concluded that these hotels "are appending the term 'Chicago' to their respective marks as a geographic identifier." We too agree; LHO has a "better than negligible" chance of showing that it exclusively used the would-be "Hotel Chicago" mark. Regarding secondary meaning, however, Magistrate Judge Cox noted that LHO "appears to have an uphill battle." This, indeed, is "an uphill battle" for LHO, and it has yet to enlist.

Importantly, Magistrate Judge Cox stated that "it will be very difficult for LHO to prove that consumers associate the mark 'Hotel Chicago' with the River North Hotel without the appropriate surveys and testimony." She elaborated on her comment, stating that "[t]his is especially true given the relatively short amount of time LHO has been managing the River North Hotel under its name, and the relatively weak mark at issue in this case." LHO did not heed Magistrate Judge Cox's advice. It did not provide evidence of factors (4) or (5)—consumer testimony and consumer surveys—at the hearing.[1]

---

[1] Defendants offered evidence in the form of an unscientific survey and video evidence thereof, conducted by Knoedl and titled "Street Interviews Chicago, IL Oct. 2016." The Court placed no weight on the survey, as we found that it had no probative value. *See McNeil-PPC v. Pfizer Inc.*, 351 F. Supp. 2d 226, 249 (S.D.N.Y. 2005) ("Survey results are useful and have 'evidentiary value' if the surveys are properly designed and objectively and fairly conducted—for example, they employ 'filters' to screen out individuals whose responses may distort the results; the questions are directed to 'the real issues;' and the questions are not leading or suggestive."); *A.J.*,

"Consumer testimony and consumer surveys are the only direct evidence" of secondary meaning; "[t]he other factors are relevant in a more circumstantial fashion." *Int'l Kennel Club*, 846 F.2d at 1085 (citation omitted). "Survey evidence is not required to establish likelihood of confusion, but it is often the most persuasive evidence . . . [and] a plaintiff's failure to conduct a consumer survey, assuming it has the financial resources to do so, may lead to an inference that the results of such a survey would be unfavorable." *Univision Music LLC v. Banyan Entm't*, No. CV 04-9242 DSF, 2004 WL 5574359, at *3 (C.D. Cal. Nov. 15, 2004) (citation omitted). LHO's lack of consumer testimony and consumer surveys is not *per se* fatal to LHO. *See Int'l Kennel Club*, 846 F.2d at 1086. However, while LHO claims that it "has worked so hard and expended so much to acquire" secondary meaning, the record indicates otherwise. The Court analyzes the remainder LHO's evidence, factors (1)-(3)—the amount and manner of advertising, the sales volume, and the length and manner of use—below, beginning with the first factor.

### a.    The Amount and Manner of Advertising

Magistrate Judge Cox concluded that LHO's "advertising evidence demonstrates that LHO has a better than negligible chance of showing secondary

---

796 F.2d at 907 ("The survey simply failed to demonstrate whether or not the public associates chocolate fudge with [plaintiff]."). The survey was unhelpful as, among other flaws: Knoedl is not an expert; she has no training in conducting consumer surveys; Perillo provided Knoedl with a list of questions to ask passersby; LHO elicited Knoedl's potential bias, as she previously worked for Perillo; and some answers and questions were omitted from the edited version of the video that Defendants provided the Court. Moreover, Knoedl was not questioning the target audience: the interviewees were not asked whether they had ever stayed at or searched for a hotel in Chicago, instead she concentrated on individuals who *lived* in Chicago.

meaning," as it "has spent [a] significant amount of time and effort advertising the relevant mark." We disagree. "Advertising is relevant because it is the means by which a manufacturer establishes its trademark in the minds of consumers as an indication of origin from one particular source; it is especially persuasive if the exposure has been '*massive*.'" *Gimix*, 699 F.2d at 907 (quoting *FS Servs., Inc. v. Custom Farm Servs., Inc.*, 471 F.2d 671, 674 (7th Cir. 1972)) (emphasis added). "Evidence of advertising and sales," however, is circumstantial, and it "does not necessarily indicate that consumers associate a mark with a particular source, particularly when the advertisements and promotions do not specifically emphasize the mark." *Platinum*, 149 F.3d at 729.

LHO claims that it has expended over 4 million dollars in general advertising and marketing of the River North Hotel. At the hearing, Deinhart testified that in 2014, LHO spent $1,007,816; in 2015, it spent $1,071,550; and through the end of September 2016, it spent $785,248 on sales and marketing of the would-be "Hotel Chicago" mark. These numbers include "total salary and wages, all advertising promotion, [and] collateral expenses." Further, it has paid over 2 million dollars to Marriott "in connection with the franchise agreement," which also contributes to advertising. Finally, the River North Hotel is globally marketed with over 4,000 Marriott hotels in over 80 countries and territories. These are sizable contributions with a widespread reach of *general* advertising. However, of the total amount, LHO

devoted $300,000 specifically to "brand awareness marketing," or "marketing the 'Hotel Chicago' name."

In their objections, Defendants questioned whether LHO's advertising expenditures, and $300,000 dedicated to marketing the "Hotel Chicago" name, are sizeable investments. In an attempt to contextualize the $300,000 figure, Defendants engaged in a rough calculation, which LHO did not address in its Reply. In sum, Defendants argue that LHO's expenditure on "brand awareness marketing" equates roughly $100,000 annually. According to Defendants, the River North Hotel "appears to be advertised with 333 rooms" available. Defendants multiplied 333 rooms "by the number of days in the year," and calculated "121,545 night rooms." They reason that if each room is booked "at an average of $200/night," the River North Hotel "generates $24M in revenue" annually. Thus, Defendants conclude that $300,000 is only "a fraction of one percent" of LHO's annual revenue. They claim that this is a tiny amount because "experts seem to suggest that a 5% marketing budget" is acceptable.

LHO asserts that "Defendants' insinuation that LHO needed to have spent more than $300,000 in less than three years in brand awareness marketing . . . is of no consequence and is contrary to case law." However, it is relevant to the amount of advertising, which is of consequence to determining secondary meaning, and it is also in line with case law cited by LHO itself. *See Int'l Kennel Club*, 846 F.2d at 1086–87. Indeed, this number starkly contrasts with that in *International Kennel Club*, where

"[i]n its most recent fiscal year, . . . advertising and public relations expenses . . . amounted to . . . more than 42 percent of the club's total administrative and operating expenses," totaling "more than 25 percent of the club's total revenues." *Id.* at 1086; *see AutoZone, Inc. v. Strick*, 543 F.3d 923, 933 (7th Cir. 2008) (finding that the AutoZone mark "has been the subject of hundreds of millions of dollars' worth of advertising since 1987").

### b.    The Sales Volume

Regarding the sales volume, LHO first argues that it "booked approximately 300,000 room nights at the River North Hotel since February 2014"—nearly a "20 percent increase in bookings compared to" Hotel Sax.  Further, LHO's occupancy has increased from about 65-66 percent in 2013 to an estimated 87-88 percent in 2016.  These growths, however, do not mirror those experienced by the plaintiff in *A.J.*, where following an article discussing his product, plaintiff experienced near "100-fold times" his prior volume.  *See A.J.*, 612 F. Supp. 1081, 1084 (N.D. Ill. 1985).

Second, Deinhart testified that the River North Hotel has 2,043,013 "impressions" on Facebook.  Of the greater than 2 million impressions, 2,541 "lik[ed] what they're seeing"—either their "experience at Hotel Chicago, . . . the product , . . . the service, . . . location, and others looking at that saying I like what I just read or saw."  Finally, "267 of them click[ed] links for" the River North Hotel.  Dienhart believed that 2 million impressions is "a lot," and that the amount of "likes" that the River North Hotel had was "exciting."  The River North Hotel also had 1,200 online

reviews.  Deinhart concluded that this online chatter means that the River North Hotel is "pretty popular and . . . liked and well known."  However, the River North Hotel's popularity on social media is hardly evidence that masses of people associate the would-be "Hotel Chicago" mark with LHO.  Nor are we convinced that this sales volume is exceptional.  In *Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corporation*, for example, the Court concluded that defendants' sales of over "$195 million in merchandise bearing the Planet Hollywood marks, which was nearly forty percent of the annual direct gross revenues from the Planet Hollywood establishments" in 1997, is a "level of sales" that "persuades the Court both that the Planet Hollywood marks . . . have wide circulation among the consuming public, and that a large number of people have visited the Planet Hollywood restaurants throughout the country."  80 F. Supp. 2d 815, 840 (N.D. Ill. 1999).

### c.     The Length and Manner of Use

Lastly, and least promising to LHO, LHO has been using the would-be "Hotel Chicago" mark for less than 3 years, since February 2014.  LHO cites to *International Kennel Club*, stating that the Seventh Circuit agreed with the District Court "that the mark International Kennel Club had acquired secondary meaning and thus was a protectable trademark where the plaintiff had operated under that name continuously for *several years*."  *See* 846 F.2d at 1086–87 (emphasis added).  However, LHO fails to mention that the International Kennel Club's "several year" use was *over 50 years*. *See id.* (emphasis added).

LHO again cites to *A.J.*, arguing that similarly to the plaintiff in *A.J.*, it has been using the would-be "Hotel Chicago" mark for many years, "spent substantial amounts in advertising and" promotion, and "received nationwide newspaper and magazine publicity." *See* 796 F.2d at 907. This case is different from *A.J.* In *A.J.*, plaintiff "was the only soft drink company using the label Chocolate Fudge on a chocolate-flavored soft drink" for *13 years*. *Id.* (emphasis omitted and added). This is more than four times as long as LHO has been using the would-be "Hotel Chicago" mark. Additionally, plaintiff estimated "that it and its licensees will spend up to $6 million in the next *year*[,1985,] in advertising and promoting the product." *A.J.*, 612 F. Supp. at 1084 (emphasis added). Thus, plaintiff expended up to 6 times the amount in advertising as LHO during the course of 1 year. Finally, plaintiff's "diet chocolate fudge soda . . . received nationwide publicity" in an article, "which [wa]s syndicated in 80 newspapers across the country," and in magazines such as *The New York Times*, *Time*, and *People*. *A.J.*, 796 F.2d at 907. In the four months following the "article, sales of [plaintiff's] Chocolate Fudge aggregated 50 million cans." *A.J.*, 612 F. Supp. at 1084. At the hearing, LHO stated that since 2014 the River North Hotel has booked "approximately 300,000 room nights," "represent[ing] a nearly 20 percent increase in bookings compared to" Hotel Sax. However, this pales compared to near "100-fold times" plaintiff's prior volume in *A.J.* There is no such "unprecedented success story here." *See id.* Nor is there a particular "uniqueness" similar to plaintiff's "use of Chocolate Fudge . . . for a carbonated soft drink." *Id.* In *A.J.*, "[t]he evidence [wa]s

sufficient to show that when consumers think of diet chocolate fudge soda they think of" plaintiff. *A.J.*, 796 F.2d at 907. That does not hold true with the would-be "Hotel Chicago" mark and LHO.

The Case law is not favorable to LHO. In *Gimix*, the Court had doubts about a five-year time period of use, noting that it "is so brief as to cast serious doubt upon the very possibility of having established a strong secondary meaning." 699 F.2d at 907. Even in *Ty, Incorporated*, where the Court held that although plaintiff used the mark "Beanie" for only three years, the short amount of time did "not preclude a finding of secondary meaning," plaintiff pointed to surveys which "indicated that 72.6 percent of the respondents thought that 'Beanies' and 'Beanie' either meant or referred to Beanie Baby/Babies or Ty or referred to a toy made or put out by Beanie Baby/Babies or Ty." *Ty, Inc.*, 98 F. Supp. 2d at 995, 997. Further, "Beanie" "received 'massive' publicity in connection with its toys, in a variety of media including newspapers, magazines, television and radio." *Id.* at 996. The length and manner of use does not weigh in favor of LHO.

The instant case is similar to *Platinum*. *See* 149 F.3d 722. In *Platinum*, plaintiff asserted common law rights to the would-be "Platinum" mark for mortgage services. *Id.* at 725. LHO is also asserting common law rights to the would-be "Hotel Chicago" mark for hotel services in Chicago. The District Court held that "Platinum" is merely descriptive, not suggestive, "when used in connection with" plaintiff's mortgage services. *Id.* at 728. We too hold that "Hotel Chicago" is, at best,

descriptive.  Plaintiff "used its name for only three years."  *Id.*  LHO used the name "Hotel Chicago" for less than three years.  Neither LHO nor the plaintiff in *Platinum* offered consumer testimony or surveys.  *See id.*

The plaintiff in *Platinum* "was the third largest offeror of government-backed mortgages in the state of Illinois," and "[s]ince entering the business" about four years before the lawsuit, it "closed more than 5,900 mortgages totaling approximately $700,000."  *Id.* at 731 (Wood, J., dissenting).  Moreover, plaintiff "incurred approximately $649,000 in promotional expenditures" between 1994 and approximately 1997, and constructed and maintained "a large constantly illuminated billboard on a major highway west of Chicago."  *Id.*  The construction of the billboard exceeded $150,000, and plaintiff expended over $2,000 monthly to maintain and operate it.  *Id.*  Plaintiff also "advertise[d] throughout the Chicago region, ha[d] a web site, and appear[ed] at trade shows."  *Id.*  LHO has booked approximately 300,000 room nights at the River North Hotel, and its occupancy rates continue to increase. LHO has also globally promoted the River North Hotel as part of Marriott's Autograph Collection, and it claims that "the Autograph Collection is the lodging industry's fastest growing upscale brand."  The River North Hotel is popular online and on Facebook, and LHO spends over a million dollars annually to generally advertise it.

Finally, in *Platinum*, plaintiff submitted evidence of 25 consumers calling plaintiff and inquiring about the rates that were advertised by defendant.  *Id.* at 732.

Further, defendant admitted to "receiving at least five telephone calls derived from people seeing" plaintiff's large billboard. *Id.* Lastly, professionals "also confused the two companies, on at least three occasions either sending checks and bills to or telephoning the wrong firm." *Id.* LHO does not contend that industry experts are confusing the two hotels. LHO did, however, offer evidence of confusion from at least 17 consumers, and Defendants admitted that consumers have called the Medical District Hotel believing that they were speaking with a representative from the River North Hotel. Defendants, however, contend that with a total number of 61,596 rooms booked, LHO only recorded 17 instances of confusion, yielding 0.02% confusion rate. They argue that this rate is not significant. "*[D]e minimus* evidence of actual confusion does not necessarily establish a likelihood of consumer confusion." *Id.* at 729. Further, Jivani, who has worked in the hotel industry for 20 years, testified that based on his personal experiences, confusion at hotels is "very common." He provided an example of a consumer who arrived at the Medical District Hotel when the consumer had a reservation in the W City Center on Adams. The Court noted in *Platinum* that plaintiff "did not submit any consumer testimony or consumer surveys to support its assertion that it has acquired secondary meaning," and it held that plaintiff's "evidence of sales, advertising, and promotions," in addition to the fact that it "used its name for only three years," "fail[ed] to indicate it could establish that it has acquired secondary meaning." *Id.* at 729.

In consideration of all of the factors, LHO argues that its "widespread and continuous use of the" would-be "Hotel Chicago mark, the amount and extent of marketing, and the significant number of bookings demonstrate that hotel guests have learned to associate the" would-be mark with LHO. We disagree. First, popularity is not equivalent to secondary meaning. Second, the would-be "Hotel Chicago" mark is weak. "The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular . . . source." *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 464 (7th Cir. 2000) (quoting *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 959 (7th Cir. 1992)). "A mark that is strong because of its fame or its uniqueness, is more likely to be remembered and more likely to be associated in the public mind with a greater breadth of products or services, than is a [weak] mark." *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 276 (7th Cir. 1976). LHO's would-be mark is likely a weak descriptive mark, as acknowledged by Magistrate Judge Cox. Finally, LHO's assertion that "length of time [of use] by itself is not a determinative factor" is correct. However, without evidence of surveys and testimony, LHO has not demonstrated that it has a "better than negligible" chance of proving secondary meaning. In fact, in internal documents, LHO admitted that a weakness of the River North Hotel is that it "has yet to establish a real identity in the market," while acknowledging that "there is great opportunity and plans in place to *begin* this work *in 2015*." LHO has failed, at this juncture, to show that it is likely to

succeed in proving that "hotel guests have learned to associate the" would-be "Hotel Chicago" mark with it.

In its briefs and at the hearing, LHO focused heavily on the fact that it need only prove that confusion in the marketplace is likely, whereas in the instant case, it has evidence of actual confusion. In doing so, however, LHO has placed the cart before the horse. It is once LHO has established that it has a protectable mark that it moves to proving that "likelihood of confusion" exists. *See, e.g.*, *Avent Am., Inc. v. Playtex Prod., Inc.*, 68 F. Supp. 2d 920, 924 (N.D. Ill. 1999). In fact, the District Court in *Platinum* did not examine plaintiff's "evidence of actual consumer confusion." *Platinum*, 149 F.3d at 729. The Seventh Circuit agreed with the Court below "that consumer confusion does not exist within the scope of an infringement claim when the mark is not entitled to trademark protection," and it held that the Court did not err in its failure to examine it. *See id.* Nonetheless, it is significant to note that there are numerous distinctions among the hotels, which render it unlikely that consumers would attribute both hotels to LHO. *See Eli Lilly*, 233 F.3d at 463.

First, while the name "Hotel Chicago" is the same for both the River North and the Medical District hotels, Defendants have appended the descriptor "Illinois Medical District" when answering telephone calls and advertising through online travel agencies. Accordingly, the Medical District Hotel is held out as the "Hotel Chicago, Illinois Medical District" to consumers. Second, it is true that the parties' signs outside of the hotels both consist of the word "Hotel" written horizontally across

34

the top of the sign and the word "Chicago" written vertically below the word "Hotel." This may lead consumers to confuse the "marks;" however, the marks must not simply be compared by looking at them "side-by-side," but "'in light of what happens in the marketplace.'" *AutoZone*, 543 F.3d at 930 (quoting *Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004)). In the marketplace, consumers are less likely to associate the Medical District Hotel with the River North Hotel because the latter is the only Autograph Collection affiliate in Illinois. The River North Hotel proudly exhibits its affiliation with Marriott's Autograph Collection. Its sign displays the Autograph Collection logo, with the letters "AC" written horizontally above the word "Hotel." Thus, the Autograph Collection affiliation reduces the likelihood that consumers would believe that LHO, the purported "trademark owner[,] sponsored, endorsed, or was otherwise affiliated with" the Medical District Hotel. *Sorensen v. WD-40 Co.*, 792 F.3d 712, 726–27 (7th Cir. 2015); *see Beefeater*, 540 F.2d at 274.

Likewise, the niceties and amenities that the two hotels offer are dissimilar. LHO argues that "[t]he parties' services are identical: they both provide hotel services," citing to a First Circuit case. However, the Court need not look to the First Circuit, as the Seventh Circuit has informed the lower courts on this matter. At its most basic, both hotels offer hotel services in Chicago. Yet, at a more micro level, the hotel services are quite different. The Seventh Circuit noted in *Sorensen* "that two restaurants can be so dissimilar as to be essentially different products." *Id.* at 729. To illustrate, "[a] Michelin-starred French restaurant is wholly different from a Chinese

take-out restaurant." *Id.* While the product in *Sorensen* did not have the same "ambiance and themes" that restaurants have, which "are part of its products," the River North and Medical District hotels do. *See id.* Just as "visiting a restaurant is a service experience," so is visiting a hotel. *See id.* The services and amenities offered by the River North and Medical District hotels are so different so as to render them different products.

Indeed, in its Motion for Preliminary Injunction, LHO states that the River North Hotel is "an upscale, urban boutique hotel," which "is known as sophisticated, stylish and comfortable." Deinhart described the River North Hotel as "unique and individualistic." The River North Hotel, according to him, is "a one-of-a-kind hotel," where one will not see its "furniture, fixture, [or] finishes" elsewhere. LHO claims that Marriott selected the River North Hotel "for its Autograph Collection precisely because of the hotel's quality and character." Moreover, the Autograph Collection, according to Dienhart, exemplifies an "upscale product, great service, [and a] superior location." "It is not just the would-be mark 'Hotel Chicago' that is of value to the River North Hotel," instead, "[i]t is the larger picture of the" River North Hotel as "part of Marriott's Autograph Collection," Dienhart testified. This includes the loyalty program that the River North Hotel offers its consumers, which provides "points for free nights and flights across the globe." These luxurious characteristics and features are quite different from the Medical District Hotel, which according to its

owner, is a "nice" three-star hotel, rebranded from the bed bug infested Rosemoor Hotel.

Further, the two hotels compete for diverse patrons in distinct areas of Chicago. Courts consider "'whether there is a relationship in use, promotion, distribution or sales between the goods or services of the parties.'" *Sorensen*, 792 F.3d at 730 (quoting *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 681 (7th Cir. 2001)). "We also look to whether the parties use the same channels of commerce, target the same general audience, or use similar marketing procedures." *Id.*; *see also Mon Aimee Chocolat, Inc. v. Tushiya LLC*, No. 15 C 4235, 2015 WL 6407758, at *6 (N.D. Ill. Oct. 22, 2015). LHO contends that the parties "use the HOTEL CHICAGO mark in a virtually identical area and manner" because the Medical District Hotel "is located only three miles from" the River North Hotel. We agree that the two hotels use the same marketing channels. "Popular booking sites, such as Orbitz, Expedia, and Priceline, all list both properties in their booking listing, and" the Medical District Hotel appears before the River North Hotel "in the search listing." Also, "guests can book rooms at" the Medical District Hotel "through Portfolio Hotels & Resorts' website at 'hotelchicago1622.com,' a domain name that is very similar to HEI Hospitality's domain name of 'thehotelchicago.com.'"

The two hotels are also in direct competition to the extent that they are both hotels in Chicago, Illinois. However, the targeted consumer market is dissimilar. Jivani testified that, based on his personal knowledge from working in the hotel

industry, when consumers book a hotel, they pay attention to the location, price, and loyalty programs. Although the River North and Medical District hotels are located only three miles apart, in Chicago, this places them in quite unalike neighborhoods with different attractions. Indeed, these are not "two neighboring restaurants opening on the same street with the same name." The Medical District Hotel targets consumers with loved ones in the nearby hospitals, those who desire to attend sporting and concert events at The United Center, and foodies who seek to experience the delicacies on Randolph Street. The River North Hotel, in contrast, targets those who come to the city to experience the preeminent nightlife in Chicago, with the many four-star and famous clubs, restaurants, and bars in that area of Chicago. The two hotels also lease rooms at different rates, and the River North Hotel attracts guests who seek to "enjoy all of the benefits of Marriott Rewards."

Lastly, in its Brief in Support of its Motion for Preliminary Injunction, LHO argues that the Court should simply "infer that Defendants adopted the Hotel Chicago mark with intent to palm off their hotel services as those of LHO." Since Jivani, Defendants' General Manager as of April of 2016, is the former Director of Front Office for the River North Hotel, LHO claims that "Defendants cannot reasonably maintain that they lacked knowledge of Hotel Chicago or LHO's use of the" would-be "Hotel Chicago" mark. LHO also contends that when Gulla "reached out to Perillo on June 14, 2016, . . . she spoke with Jivani, who asked if she was calling in regards to the 'similarity' between the parties' hotel names." However, "Perillo submitted a

declaration . . . stating that he personally was not aware of" the River North Hotel "until LHO's June 15, 2016 cease and desist letter." Perillo testified to the same at the hearing. Perillo stated that he wanted to call the Medical District Hotel "Hotel Chicago" because he "was born in Chicago," "raised in Chicago," has "a business in Chicago," "live[s] in Chicago," and even his "e-mail address is Chicago guy," so he "consider[s] [him]self a true Chicagoan." Further, Perillo indicated that after hearing "the song Hotel California," he "couldn't remember a hotel in Chicago called Hotel Chicago," so he asked his attorney whether he can obtain the name "Hotel Chicago." Regardless, "[m]ere knowledge of someone else's mark is insufficient to show intent to pass off." *Sorensen*, 792 F.3d at 731.

While Magistrate Judge Cox noted that there was "no direct evidence that Defendants are trying to palm off their hotel as being managed by LHO," the evidence presented at the evidentiary hearing demonstrated that Defendants are not attempting to do so. Perillo testified, in part, as follows:

> [t]he name of the hotel in itself is important to me . . . . This is an attack on my name and my reputation. I did everything correctly in choosing this name. I had . . . my attorney do a search to see if that was available. Had I seen the plaintiff's name on that hotel, I wouldn't dare put my sign up. But it was available. I did it legally . . . . I had him file the papers with the Secretary of State . . . . I'm small, they big . . . . I'm a pretty fair-sized automobile dealer. I'm one of the biggest . . . privately own[ed] . . . . My . . . family name is on all of them, Perillo. If I like the name of a dealer that just went up and he was small, and I thought Luxury Motors, maybe I'll put Perillo Luxury Motors, I'm bigger than he is, I'll just spend a lot of money and I'll take his name, and if he takes me to court, I'll tell him, 'I spend more money than him. And if I could win, that would be terrible . . . . So, what it means to me, taking a sign

down, I would rather them come and buy the sign from me before I put it up. But now that it's up, if I'm forced to take that sign down, your Honor, that's attack on me and my integrity . . . My parents came to this country, my grandparents, . . . they came penniless. I'm living their dream . . . . And for me to have an article put in my paper that I did something wrong . . . and I was forced to take it down is an attack on my name and my integrity.

Perillo's testimony revealed that Defendants' actions are not ill-intentioned. *See Eli Lilly*, 233 F.3d at 465.

## II.    No Adequate Remedy at Law and Irreparable Harm

Once Magistrate Judge Cox concluded that LHO has a "better than negligible chance" of succeeding on the merits, she then found that LHO: (i) does not have an adequate remedy at law, and (ii) will suffer irreparable harm should the injunction be denied. These two requirements are practically presumed: (i) "[b]ecause of the difficulty in assessing the loss of goodwill associated with trademark infringement, courts regularly hold that there is no adequate remedy at law for a victim of trademark infringement," *see Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002), and (ii) "it is generally understood that trademark infringement . . . will cause irreparable injury." *See id.*; *Processed Plastic Co. v. Warner Commc'ns, Inc.*, 675 F.2d 852, 858 (7th Cir. 1982). Thus, she found that LHO proved "irreparable harm for which no adequate remedy at law is available." Because we do not believe that LHO has a protectable mark, we do not find that it lacks an adequate remedy at law nor do we believe that it will suffer irreparable harm awaiting a full trial on the merits.

### III. Balancing of Hardships

The balance of hardships does not favor LHO. The Court balances "the irreparable harm that [Defendants] will suffer if preliminary relief is granted . . . against the irreparable harm [LHO] will suffer if relief is denied." *Ty, Inc.*, 237 F.3d at 895. Using a "sliding scale" approach, "the more likely [LHO] will succeed on the merits, the less the balance of irreparable harms need favor" its position, and "the less likely [LHO] is to win, the more it must weigh in" its favor. *Id.*; *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). In balancing the interests of the parties, Magistrate Judge Cox operated under the assumption "that LHO has a very strong likelihood of succeeding on the merits," and that "the only close call is whether . . . LHO can show that its mark has gained secondary meaning." Establishing secondary meaning is key for LHO, and based on the evidence of record, it is unlikely to prove this on the merits. This changes our "sliding scale" analysis.

In its Brief in Support of its Motion for Preliminary Injunction, LHO argues that its "several examples of actual confusion, resulting in distraught and disappointed guests and prospective guests, illustrates the loss of goodwill resulting from Defendants' infringement of the HOTEL CHICAGO mark." While goodwill is illusive, LHO is not suffering tangible harm: its gross profits totaled $6.5 million in 2014; $9.1 million in 2015; and $10.8 million in 2016. Thus, its profits continue to increase, irrespective of the existence of the Medical District Hotel. It is true "that 'the owner of a mark is damaged by a later use of a similar mark which place[s] the

owner's reputation beyond its control, *though no loss in business is shown*,'" *Int'l Kennel Club*, 846 F.2d at 1091 (quoting *Beefeater*, 540 F.2d at 276), but LHO's own acknowledgment that the River North Hotel is the one and only Autograph Collection hotel in Illinois cuts against its argument that its reputation will be harmed by the Medical District Hotel. LHO alleges that Defendants' harm is not irreparable, claiming that they "may still own and operate a hotel in downtown Chicago." However, if the Court grants the Motion for Preliminary Injunction, Defendants will have to rebrand the Medical District Hotel. If Defendants win at trial, they will have to rebrand again, which is not inconsequential.

## IV.    The Public Interest

Neither does the public interest mitigate in favor of granting the instant Motion. "A court when weighing the interests of the private parties and the public interest should try to 'minimize the costs of being mistaken.'" *Ty, Inc.*, 237 F.3d at 902 (citation omitted). "[T]he protection afforded to a trademark attempts to prevent consumer deception and confusion," but "trademark protection should not interfere with the traditional policies of a competitive market, and courts have generally recognized that the public substantially benefits from competition." *Platinum*, 149 F.3d at 726; *see Champion Roofing, Inc. v. Champion Window Mfg. & Supply Co., LLC*, No. 13 C 5478, 2013 WL 6669476, at *6 (N.D. Ill. Dec. 16, 2013). Magistrate Judge Cox concluded that, because of LHO's "anecdotes of actual customer confusion," "a preliminary injunction 'will prevent, rather than cause, harm to the

general public through the elimination of potential confusion.'" *See Ty, Inc.*, 237 F.3d at 895; *Meridian*, 128 F.3d at 1121.

However, in their objections, Defendants argue that "misunderstandings between the multitude of hotels in Chicago are commonplace in the industry." They offer Stanley Wozniak's, an individual who visited several hotels in the Streeterville and Gold Coast areas of Chicago to speak with the employees at the front desk, declaration in support of this contention. Wozniak "spoke with hotel employees who informed him that misunderstandings among hotel customers" occur regularly. Defendants provide proof that another Chicago hotel unrelated to this matter "has at least one customer per week" arrive "believing that he or she has actually booked a room at" the River North Hotel. Defendants conclude that LHO's "evidence of actual confusion is hardly evidence that a preliminary injunction" would serve the public interest. We are not convinced that the public's interest in remaining confusion-free will be served should the injunction issue. Consumers appear to be confused regardless of whether there are two "Hotel Chicagos," given mass appendages of the terms "Chicago" and "Hotel" by other hotels throughout the city to their own hotel names. Moreover, LHO's instances of confusion have decreased in recent months, which may be due to the Medical District Hotel's addition of the descriptor "Illinois Medical District" to its name when advertising through online travel agencies and in introducing itself to potential consumers.

We also consider "'the consumer's interest in not being deceived about the products they purchased.'" *Platinum*, 149 F.3d at 734 (Wood, J., dissenting) (quoting *Int'l Kennel Club,* 846 F.2d at 1092 n.8)). Because of the River North Hotel's attractive affiliation with Marriott's Autograph Collection—the only one in the entire state—targeted consumers, those who seek such benefits, are unlikely to be deceived. We do not find that that the public interest would be served should the Court grant the injunction, nor will it be disserved by our denial. Thus, at this time, we deny LHO's Motion for Preliminary Injunction.

"It may be that after a full trial . . . the record will support [LHO's] claim; the current record does not." *See id.* at 730. At the evidentiary hearing, Perillo stated, "[a]ll I'm asking the Court is if I could leave that sign up until a jury tells me I did something wrong." In spite of some of Defendant's rather puzzling arguments in Response, LHO simply has not provided the Court with sufficient facts to establish that it is likely to succeed on the merits in demonstrating that the would-be "Hotel Chicago" mark has acquired secondary meaning. At this time, the Court will not prevent Defendants from calling the Medical District Hotel "Hotel Chicago" or from using the would-be "Hotel Chicago" mark in connection with hotel services.

## CONCLUSION

For the aforementioned reasons, we deny LHO's Motion for Preliminary Injunction. Defendants are not precluded from using the would-be "Hotel Chicago"

mark in connection with hotel services pending a full trial on the merits.  It is so

ordered.

Dated:  2/3/2017

Charles P. Kocoras
United States District Judge